OPINION
{¶ 1} Mother-appellant Brittany Spears ("Brittany") brings this appeal from the judgment of the Court of Common Pleas of Marion County, Juvenile Division, terminating her parental rights. For the reasons discussed below, the judgment of the trial court is reversed.
 {¶ 2} On July 21, 2003, Brittany gave birth to Dezarae Haller ("Dezarae"). At that time, Brittany was 16 years old and was residing in the home of Dezarae's father, Brandon Haller ("Brandon") with Brandon, his siblings and his mother, Regina Delapaz ("Regina"). Brandon was also a minor at the time of Dezarae's birth. Due to issues that arose while Brittany was living with Brandon and Regina, Regina asked Brittany to leave. Brittany's mother refused to permit Brittany and Dezarae to live with her and turned Brittany's custody over to the Marion County Children's Services Board ("the Agency"). Brittany and Dezarae were found to be *Page 3 
dependent and were placed in the same foster care home on February 7, 2004. A case plan was instituted to help Brittany learn how to care for Dezarae. In July of 2004, Brittany and Dezarae were moved from a foster home in Piqua to the Rostorfer's foster home in Marion. Due to an argument between Brittany and Brandon at his home, Dezarae was removed from the foster home in August of 2004, and placed in a different home. Dezarae was returned to Brittany on December 8, 2004.
 {¶ 3} In May of 2005, Brittany and the Rostorfer's daughter consumed alcohol in the Rostorfer's home. The Rostorfers, the agency, and Brittany all decided that it was time for Brittany to leave foster care. Originally Brittany was to move into her own apartment in June of 2005, and be granted custody of Dezarae in September of 2005. The case plan called for Brittany to attend high school, maintain her job and income, obtain and maintain safe and stable housing, demonstrate a responsible lifestyle, demonstrate parenting skills, remain drug and alcohol free, attend counseling, arrange appropriate day care, care for the basic needs of Dezarae, and pay all outstanding court fines from her issues in juvenile court. Due to a problem outside the control of Brittany with obtaining housing, Brittany's apartment was not available until August of 2005. As a result, the Agency decided that Dezarae would not be returned in September. *Page 4 
 {¶ 4} On August 24, 2005, the Agency terminated its custody of Brittany. The Agency provided limited assistance to Brittany so that she could obtain housing. The Agency provided the first month's rent and the security deposit, 75% of the second month's rent, 50% of the third month's rent, and 25% of the fourth month's rent. The Agency also provided $250.00 to buy furnishings and household supplies. Finally, the Agency paid for the first grocery trip for Brittany. The Agency worker testified that she had no knowledge of other services for which Brittany would qualify.
 {¶ 5} Brittany maintained the apartment in a clean manner and did excellent for the first couple of weeks. Once September came and Brittany returned to school, her progress slowed down. She eventually stopped going to school. She then was involved in an automobile accident and suffered injury. Due to her absenteeism from work, she lost her job at Wendys. Eventually, the Agency received information that Brittany was having parties at her apartment where underage drinking occurred.[1]
The Agency then terminated Brittany's unsupervised visitation. Brittany's visits with Dezarae soon became supervised at the Agency only and allowed Brittany no other contact with Dezarae.
 {¶ 6} Brittany continued her downward spiral by getting in trouble with the law for underage consumption of alcohol. She stopped going to counseling, *Page 5 
remained unemployed and dropped out of school. She did not see any reason to continue complying with the case plan because she felt that the Agency was just going to take Dezarae away from her anyway. She began dating a new man and eventually became pregnant with his child. On January 19, 2006, the Agency filed a motion for permanent custody of Dezarae.
 {¶ 7} Once the Agency filed for permanent custody, Brittany began attempts to regain custody of Dezarae. She began to study to obtain her GED, started parenting classes through the "Help Me Grow" program, signed up for counseling through the Smith Clinic, and began to attend all of her visitations. The home study revealed that she had a clean and appropriate home. She was, at that time, living with Eli Oney ("Oney"), the father of her then unborn son, in a small one bedroom apartment. The Agency did have concerns at the time that Oney was not an appropriate caretaker due to his "extensive" criminal background.[2] Brittany was not employed at the time due to her pregnancy but was being supported by Oney.
 {¶ 8} On May 1, July 6, and August 8, 2006, the trial court held hearings on the motion for permanent custody. At the hearing, the Agency presented the testimony of Sandy Anderson ("Anderson"), the independent living coordinator employed by the Agency. Anderson testified that Brittany's sole financial *Page 6 
assistance was approximately $55 per month. 2006 Tr. 44. She testified that when she went to Brittany's apartment in October 2005, there were empty beer cans all over the yard, but the house appeared clean. Id. at 51-52. She stated that Brittany terminated her services with Anderson on April 11, 2006. Id. On cross-examination, she testified that Brittany's job loss occurred due to the accident and that she was unaware of any problems with how Brittany cared for Dezarae during overnight visits. Id. at 57, 64.
 {¶ 9} Dr. Don McIntire ("McIntire"), the psychologist who completed the mental evaluation of Brittany testified next. He testified that Brittany has a possible borderline personality disorder. Id. at 88. He also testified that when Brittany is on her medication, the situation is fine and Brittany can parent. Id. at 103. McIntire also stated that Brittany does not tolerate the fear of losing Dezarae well and became depressed due to this fear. Id. at 111.
 {¶ 10} Ed Klages was a counselor called to testify by the Agency. He counseled Brittany between August 27, 2004, and March 22, 2005. Id. at 121. He testified that he believed Brittany has Oppositional Defiant Disorder. Id. at 122. However he also testified that he and Brittany did not connect and that she would not open up to him. Id. at 127-129.
 {¶ 11} Linda Umoh ("Umoh") was Brittany's caseworker. Umoh testified that Brittany violated the case plan by consuming alcohol and failing the first *Page 7 
semester of school due to absenteeism. Id. at 141, 161. She testified that Brittany's home was tidy and well kept, but there was garbage outside. Id. at 161. However, the home was appropriate for Brittany, Dezarae, and the new baby. Id. at 163. At the time of the first hearing, the home study was not complete because Umoh had not spoken to Oney. Id. at 164. Umoh was pleased that all of Brittany's drug screens were negative and that she seemed to be avoiding friendships with drug users. Id. at 165-66. Umoh was concerned that Brittany had not continued her counseling, but indicated that the counseling provided by the agency terminated when Brittany turned 18. Id. at 168. She had checked on Brittany's claim in April that she was seeking counseling from the Smith Clinic and found that Brittany was not yet receiving counseling. Id. at 169. Umoh testified that she has no concerns concerning Brittany physically harming Dezarae. Id. at 171. However, Brittany had missed the majority of her visits at the agency since supervised visits started. Id. at 174. Umoh further testified that Dezarae is upset after the visits because she wants to go with Brittany. Id. at 177. Brittany and Dezarae do have a strong bond. Id. at 205. Umoh was unable to determine when Brittany would be able to effectively parent Dezarae as that would be a "group decision." Id. at 185.
 {¶ 12} Patty Dale ("Dale") was the mentor employed by the Agency to assist Brittany. She testified that she decided not to be Brittany's mentor anymore *Page 8 
after some money disappeared from her house. Id. at 227. Although she did not know if Brittany had taken it, she suspected she did since her family all denied doing so. Id. She also testified that although she does not know if Brittany was drinking at her apartment, she assumed so from comments made by Brittany. Id. In Brittany's favor, Dale testified that Brittany would do anything to get Dezarae back and that she believed good decisions would come as Brittany matured. Id. at 235-236. Dale testified that, in her opinion, Brittany could be ready to parent Dezarae within six to twelve months. Id. at 238.
 {¶ 13} Nancy Bernhard was the employee of the Agency who testified as to Oney's criminal record. She conducted a search of court records and learned that Oney had an extensive misdemeanor record. The convictions included one charge of child endangerment, eight charges of trespassing, one charge of public indecency, and one assault charge. Id. at 243-245. No details, beyond the charge and the outcome, concerning the various offenses were known.
 {¶ 14} On July 7, 2006, the second hearing was held. Teresa Rostorfer ("Rostorfer"), the foster mother of Dezarae as well as Brittany, testified for the Agency. Rostorfer testified that Brittany had aged out of foster care. Id. at 257. Although she had heard that Brittany was consuming alcohol, she had no knowledge of such. Id. at 268. In Rostorfer's opinion, there was a strong bond between Brittany and Dezarae and Brittany took good care of Dezarae. Id. at 272. *Page 9 
Rostorfer also testified that she did not believe Brittany's rights should be terminated. Id. at 289. This testimony was the conclusion of the Agency's case.
 {¶ 15} Brittany was the next party to testify. She testified that she had been at her current residence for five months. Id. at 295. She admitted that in September 2005, she hosted parties at her apartment, but denied that she had been drinking. Id. at 297. She also testified that there were no parties when Dezarae was there. Id. After her visits were stopped, she started drinking and had underage consumption charges filed against her. Id. at 298. Since the filing of the motion for permanent custody, she testified that she had begun parenting and GED classes. Id. at 298-99. Brittany had had no additional conflicts with law enforcement, passed her drug screens, and was able to provide a safe environment for her children. Id. at 299. Brittany also testified that she had begun counseling at the Smith Clinic in May of 2006. Id. at 300.
 {¶ 16} Regina testified that she also would like to have custody of Dezarae if Brittany was found unfit. She stated that she would like legal custody with the ultimate goal of reunification of Dezarae with her parents when they were ready to be good parents. Id. at 367. She also testified that she was willing to adopt Dezarae if that were the appropriate option. Id. at 369.
 {¶ 17} Brandon testified that all of his drug screens were negative. Id. at 374. He was unhappy with the fact that the Agency had not offered him any *Page 10 
services as the father. Id. at 376. He claimed to have completed anger management, parenting, and drug issues classes while serving his prison term. Id. at 378. He wanted Regina to have custody of Dezarae. Id. at 413.
 {¶ 18} On July 28, 2006, the first GAL, John Minter ("Minter"), filed his report with the court. In the report Minter stated that he saw a strong bond between Brittany and Dezarae and that Brittany obviously cared for her daughter. GAL Report, 5. Minter noted that Brittany had some issues with alcohol after her emancipation. Id. On April 25, 2006, Minter made a visit to Brittany's home where she resided with Oney. Id. at 6. He found the apartment to be clean and uncluttered. Id. There was a crib, a play area, and space for Dezarae's toys and clothes. Id. Minter stated that Rostorfer told him that losing Brittany would be detrimental to Dezarae, though she did not believe Brittany was capable of parenting Dezarae on her own yet. Id. at 14. Rostorfer stated that Brittany is a loving and caring mother who could eventually care for Dezarae. Id. at 15. Minter then recommended that the motion for permanent custody by denied, that the Agency retain temporary custody, that Regina be given additional visitation, and that Brittany continue supervised visits with the intention of moving to unsupervised visits and eventually to custody. Id. The GAL recommended that a review be done in 90 to 120 days to see if progress was made. The reason for Minter's recommendation are as follows. *Page 11 
 I made the above recommendations for the following reasons. I believe Dezarae loves her parents and her family and they love her. I also believe there is a bond between Dezarae and her family. I believe Dezarae is at an age where the severing of these ties unnecessarily would be very traumatic. All of my discussions with people who saw Brittany, Brandon and Brandon's family with Dezarae indicate they provide love and support to Dezarae's life. I believe due to Brittany and Brandon's young age and the progress they have made, they deserve more time to show they are capable of caring for Dezarae on their own. Brittany made significant progress while in foster care and appears to be making some progress now. Her inconsistency in making decisions in Dezarae's best interest and her current relationship with [Oney] prevents me from placing Dezarae with her at this time.
 * * *
 I believe maintaining a family is extremely important. Based on my observations, Dezarae enjoys her family and has an appropriate role in it. She enjoys and benefits from contact with Brittany and Brandon. Brittany and Brandon are almost children themselves and have made several mistakes. It is their young age and visible progress that makes me think they could take custody of Dezarae in a reasonable period of time.
Id. at 16-18. A hearing was held on August 8, 2006, to allow questions of Minter. Minter testified that he recommends denial of the motion and saw Brittany as making progress.
 {¶ 19} On September 21, 2006, the trial court entered judgment granting permanent custody of Dezarae to the Agency and terminating Brittany's parental rights. Brittany filed her notice of appeal on October 19, 2006. She filed a motion for stay of execution on October 25, 2006, so that she could continue *Page 12 
visiting with Dezarae pending appeal. The trial court denied the motion without hearing on December 18, 2006. Thus, Brittany's visitations with Dezarae were terminated. On April 16, 2007, this court issued a judgment reversing the judgment of the trial court and remanding the case for further proceedings. The basis for the reversal was that the trial court had failed to address the GAL report when making its decision. On the same day that this court reversed the judgment of the trial court, Brittany filed a motion for modification of custody and indicated that she would like to visit with Dezarae. On July 19, 2007, the trial court set the matter for pretrial on July 25, 2007. No modification or grant of visitation was addressed. The record contains no information as to what occurred at the pretrial.
 {¶ 20} On August 10, 2007, the new GAL, Douglas B. Diequez ("Diequez") filed his initial report. He stated that he had visited Brittany's home on August 2, 2007. Aug. 10, 2007 Report, 1. The home is owned by Oney, but he does not live there. Brittany lives there rent free in lieu of child support from Oney for their son, Eli. Id. Brittany was employed at Field Container in Marion and was earning $8.90 per hour for a 40 hour week with occasional overtime. Id. She has appropriate care for Eli while working. Id. She was current on her bills and had had no contact with law enforcement for more than 16 months. Id. In Diequez's opinion, the home was appropriate and clean. Id. at 2. There was adequate food for Brittany and Eli. Id. Brittany expressed her desire to visit with *Page 13 
Dezarae, even if it were supervised visits at the Agency. Id. Diequez stated that since Dezarae and Brittany already have a bond, allowing visits would not be too disruptive. Id. Diequez then recommended that supervised visitations be granted.
 {¶ 21} On August 24, 2007, the trial court held a hearing to address the reports of Minter and Diequez. Minter testified at the hearing that he still had the same opinion as he stated in his report, i.e. that the motion for permanent custody be denied. Aug. 24, 2007, Tr. 10. He also testified that he would attribute Brittany's prior inconsistent behavior to immaturity. Id. at 14.
 {¶ 22} On September 25, 2007, a new hearing was held. The Agency presented the testimony of a new caseworker, Matt Coldiron ("Coldiron"). Coldiron testified that since Brittany was not on the caseplan, he had no interaction with her and could not state whether she had completed a caseplan. Coldiron testified that he had conducted a home study which involved two visits to the home. He visited Brittany's home and determined that the housing was appropriate for a placement of Dezarae. Sept. 25, 2007, Tr. 8. Coldiron also testified that Brittany was currently employed. Id. at 11. He had learned that Brittany had been cited for drug paraphernalia and issued a summons to appear in municipal court.[3] Id. at 16. However, Coldiron did not know any underlying *Page 14 
facts, only that a citation had been issued and that she was to appear in municipal court on October 12, 2007, for a pretrial. Id. at 17, 33. Coldiron testified that the Rostorfers now wished to adopt Dezarae and that Brittany had not been allowed any visits since the prior ruling of the trial court. Id. Although Coldiron had requested two drug screens since the case was reopened and Brittany had complied, he was unaware of the results. Id. at 21.
 {¶ 23} On cross-examination, Coldiron was asked whether Brittany had complied with the prior case plan. He testified that Brittany had met the goals of obtaining suitable housing, employment, and maintaining stable income. Id. at 22. He had no knowledge of Brittany's completing parenting classes, counseling, or independent living. Id. Although Coldiron testified that Dezarae had never mentioned her mother to him, he admitted that he had only seen Dezarae a few times and that he had not asked her about Brittany. Id. at 25. Additionally, Coldiron testified as follows.
 Ms. Bruder [Brittany's attorney]: In your opinion, is [Brittany] now a fit custodian for a child?
 Mr. Coldiron: Uhm, only meeting with her twice, I don't think I could really answer that.
 Ms. Bruder: Okay. What concerns would you have with Brittany having visitation or custody with her child at this time?
 Mr. Coldiron: Uhm, probably that it's been a year since they've had contact. *Page 15 
 Ms. Bruder: Which wasn't Brittany's fault?
 Mr. Coldiron: Yeah. I think that's probably going to be the toughest issue for Dezarae.
 Ms. Bruder: Did you note any deficiencies in Brittany's home at this time?
 Mr. Coldiron: Uhm, she just needs a couple of batteries for [a] smoke detector and a carbon monoxide detector.
 Ms. Bruder: And that's something that's easy to remedy?
 Mr. Coldiron: That's correct.
 * * *
 Mr. Redmond [Brandon's attorney]: Brittany has another child now?
 Mr. Coldiron: Yes.
 Mr. Redmond: How old is the child?
 Mr. Coldiron: Uh, one.
 Mr. Redmond: Age one. And [does he] appear to you to be developing normally?
 Mr. Coldiron: Yeah.
 * * *
 Mr. Redmond: * * * And Brittany had no problems as far as you could see raising that child?
 Mr. Coldiron: Uh, no.
 Mr. Redmond: Okay. Has Brittany expressed a desire to you to get Dezarae back? *Page 16 
 Mr. Coldiron: Uh, yes.
 * * *
 Mr. Redmond: Alright. Brittany has sufficient income to support herself and her child or children?
 Mr. Coldiron: Uh, yes.
 Mr. Redmond: Okay. What's uh, Brittany's health like?
 Mr. Coldiron: Uh, she appears to be in good health.
 Mr. Redmond: Good health. Okay. Does she appear to have a good attitude about parenting? A commitment?
 Mr. Coldiron: Yeah.
 Mr. Redmond: Okay. Now, that, are you familiar with uh prior Guardian Ad Litem's report?
 * * *
 Mr. Coldiron: A little. I mean I don't
 Mr. Redmond: A little bit. I think he had recommended, that was Mr. Minter, he had recommended uh, kind of uh, ninety to one hundred and twenty day period where there could be some attempt at uh, reunification or at least progress toward the case plan. Are you familiar with recommendation?
 Mr. Coldiron: Yeah.
 Mr. Redmond: Do you think that's still possible at this time?
 Mr. Coldiron: Umm. Like I said, my biggest, the biggest concern I have is the time period that's elapsed. And what that will do to Dezarae. *Page 17 
 Mr. Redmond: Okay. But that's not uh, Brittany's fault or, at anyone's fault right?
 Mr. Coldiron: Yeah.
 Mr. Redmond: It's just the Court proceedings?
 Mr. Coldiron: Yeah.
 Mr. Redmond: Okay. Uhm, if uh the Court would order that uh, that the child uh, be reunified with uh, with Dezarae with uh, Brittany, how do uh, see that happening? How would you suggest that that work?
 Mr. Coldiron: Uhm, probably start off with supervised visits.
 Mr. Redmond: Uh huh.
 Mr. Coldiron: Uhm, then down the road move to unsupervised.
 Mr. Redmond: Okay.
 Mr. Coldiron: And then maybe like weekends.
Id. at 26-31. Coldiron did not state an opinion whether permanent custody was still in the best interest of Dezarae. He also did not recommend either way: whether permanent custody should or should not be granted. He merely stated that he was concerned with the amount of time the court proceedings were taking.
 {¶ 24} Brittany was the next party to testify at this hearing. Brittany testified that in relation to the prior caseplan, she has achieved most of the goals. None of these claims were disputed by the Agency. She testified that she had resided at her current home for approximately one year. Id. at 36. The home is *Page 18 
owned by Oney, but he no longer lives there. Id. at 39. She testified that she and Oney ended their relationship in March of 2007 and that he permits her to live in the home rent free as child support for Eli. Id. at 47. Although Oney owns the home, Brittany pays all of the expenses for the home, including utilities, taxes, and insurance. Id. at 47-48. She was current on all of her bills. Id. at 48. At the time of the hearing, Brittany had $200 in her checking account. Id. Eli has an account of $10,000 which was given to him by his paternal grandfather. Id. However, Brittany was given permission to use the money if she needed to do so. Id. Brittany testified that she had no intention of touching the money in Eli's account because it was for college. Id. Brittany also testified that she had paid in full all court costs she owed from her underage consumption charges. Id. at 51.
 {¶ 25} Brittany testified that she had completed counseling with Marge Clark ("Clark"). Id. at 38. She testified that Clark told her she was done but to come back if things changed and she felt the need. Id. She has completed the basic parenting class through Help Me Grow, but maintains contact with her case worker as a support system. Id. at 41-42. The case worker is available to provide advice for situations that Brittany does not know how to handle. Id. Brittany no longer uses drugs or alcohol. Id. at 43. She passed all drug screens requested by the Agency, including a hair follicle screen. Id. at 58. She had obtained employment of forty hours a week at a job she had held since June 2007, and has *Page 19 
appropriate childcare for her son.[4] Id. at 46. Once she passes her probationary period, she will have health insurance for herself and her children. Id. at 63. The only element of the case plan not completed was the completion of high school. Brittany admits that she has not finished the GED classes. Id. at 37. She testified that she would like to continue her education, but it is not a priority right now. Id. at 63.
 {¶ 26} Brittany admitted to being given a misdemeanor citation for possession of drug paraphernalia. Id. at 37, 44. She stated that the charge arose from a traffic stop in which her friend was driving her car with Brittany as a passenger. Id. at 44. She claims that the item belonged to her friend. Id. When questioned by the officer, the friend denied it was hers. Id. Since Brittany owned the car, she was cited for possession. Id. Brittany claimed that she is no longer friends with this person. Id. at 57. Before this instance, Brittany had not been in trouble with the law for more than a year and a half. Id. at 44.
 {¶ 27} In regards to her relationship with Oney, Brittany testified that she ended the relationship when she found out he was involved with drugs. Although he is the father of her child and they will continue to cooperate on issues involving him, Brittany testified that she has no plans to reunite with Oney. Id. at *Page 20 
64. She claims that her focus is on her children and placing them before her own wishes. Id. at 58-59.
 {¶ 28} As for her parenting skills, Brittany testified that soon after her rights to Dezarae were terminated, the Agency investigated her care of Eli. The case was closed the same day with no concerns about Eli. Id. at 53. Eli is a happy and healthy baby who is developmentally on target. Id. at 53-54.
 {¶ 29} Brittany testified that if she were to be allowed custody of her daughter again, she would like to see gradual reunification. She agreed that Coldiron's plan of supervised to unsupervised to weekend to full custody was reasonable and that she would follow it. Id. at 55. She testified that she would do anything to see her daughter. Id. She also stated that she would like to have counseling for both of them due to the time apart. Id. Although she felt it would be difficult, she was willing to work with the Rostorfers to make Dezarae's transition as easy as possible. Id. at 56.
 {¶ 30} Finally, Brittany testified that in the year between hearings, she believed she had matured. Id. She testified that she would never again take her children "for granted." Id. at 59. She believes that she is now a better parent. Id. at 61. Additionally she testified that she has a solid support system in her friends, case worker from Help Me Grow, Regina, and a neighbor who will help her when she needs a break. Id. at 62. Brittany testified repeatedly that if she is allowed *Page 21 
back in Dezarae's life, she will do whatever the Agency requires because she just wants to be a good mother now.
 {¶ 31} After Brittany's testimony, the attorney for Brandon modified their motion for custody to a request that custody be granted to Brittany. Then the final witness, Regina testified. She testified that she would provide support for Brittany and would provide babysitting for Dezarae while Brittany works. Tr. 77. Brittany's attorney then again requested visitation with Dezarae which was again denied.
 {¶ 32} On October 10, 2007, Diequez submitted his final GAL report. He reported that the Rostorfers still wanted to adopt Dezarae if possible, but would comply with a court order to allow Brittany visitations if required. Diequez also considered the testimony of Minter from the August 24, 2007 hearing as well as the testimony from the September 25, 2007 hearing. He noted that the current caseworker testified that the home was appropriate for Dezarae if visitation was permitted. Diequez then reached the following conclusions.
 This is a case involving a young woman who had a child at age 16, and was not emotionally or intellectually ready to care for her. I feel that [Brittany] has done a great deal of maturing during the four years that this case has been ongoing, and I believe that she should be given an opportunity to resume parenting time with her daughter, Dezarae. Brittany has a job, a home, and the means to support her children. She now seems to have a plan of how she wants to live her life, and seems to be in a much more stable situation that (sic) when this case began. *Page 22 
 Mr. Minter, the former GAL, had recommended that [Brittany] should be given visitation, and I concur with his recommendation. This parenting time should be supervised at first and if that goes well, the visits should gradually be increased, and there should be regular reviews of this case. I further recommend that Dezarae remain in the home of the Rostafers (sic) while this visitation occurs.
Oct. 10, 2007 Report, 3-4.
 {¶ 33} On December 12, 2007, the trial court entered its judgment granting permanent custody of Dezarae to the Agency. Brittany appeals from this judgment and raises the following assignments of error.
 First Assignment of Error The trial court's award of permanent custody of [Dezarae] to [the Agency] because it was in the best interest of the child was not supported by clear and convincing evidence, was contrary to law, and was contrary to the recommendations of both of the trial court's own appointed guardian ad litems.
 Second Assignment of Error The trial court erred in failing to return legal custody of [Dezarae] to [Brittany], contrary to the law and contrary to the evidence presented at the September 25, 2007, hearing, or alternatively failed to provide oral hearing on [Brittany's] Motion to Modify Custody as required by [R.C. 2151.353(E)(2)], Juv. R. 14(C), and Juv. R. 34(G).
 Third Assignment of Error The trial court erred in granting permanent custody of [Dezara] to [the Agency] because [the Agency] failed to make a good faith effort to implement a reunification plan for the child and [Brittany]. *Page 23 
 {¶ 34} In the first assignment of error, Brittany claims that the judgment of the trial court is not supported by clear and convincing evidence. Although this court in its remand did not require the trial court to hold an additional hearing, it chose to do so. By doing so, the trial court took additional evidence which it must then consider as well as the evidence from the initial hearings. A juvenile court is permitted to grant permanent custody to an agency if the court finds, by clear and convincing evidence that 1) it is in the best interest of the child and 2) the child cannot be placed with his or her parents within a reasonable time or should not be placed with his or her parents. R.C. 2151.414(B)(1)(a). To do this, the trial court need only to find one of the several conditions listed in R.C. 2151.414(E).
 {¶ 35} Here, the trial court did not make any findings pursuant to R.C. 2151.414(B)(1) or R.C. 2151.414(E). Instead, the trial court merely entered findings pursuant to R.C. 2151.414(D) as ordered on remand. This means that none of the new evidence presented at the new hearing was considered when determining whether there was clear and convincing evidence to support a finding that it is in the best interest of the child to terminate parental rights or in finding that the child cannot or should not be returned to her parents. Since the trial court took additional evidence, it must consider that evidence in making all of the findings, not just those missing from the original judgment. Additionally, this court notes that the original judgment was reversed, thus a new, complete *Page 24 
judgment that can stand on its own is required. A judgment that is nothing more than an addendum to the prior judgment is not sufficient.
 {¶ 36} This court will now address the findings that were made and determine if they are supported by clear and convincing evidence. Regarding R.C. 2151.414(D)(1), the trial court found that the child has been in foster care for the majority of her life and has had minimal contact with her mother. A review of the record indicates that for the first two years of her life Dezarae resided with Brittany. The fact that the two of them were in foster care together does not change the fact that they were in the same home and that Brittany was the primary caregiver.[5] Thus, the contact between the two of them was more than minimal. As of August 24, 2005, Brittany left the foster home and lived in her own apartment. For approximately one month she had unlimited access to Dezarae including some overnight visits, which is more than minimal contact. The Agency then changed the visits to supervised due to allegations of alcohol use by Brittany. Dale, her mentor, and Rostorfer, the foster mother, provided the supervisions for these visits, which occurred on a regular basis, for approximately two months. The visits were then moved to the Agency and Brittany's visits became more sporadic. However, at the time of the filing of the motion for permanent custody *Page 25 
on January 19, 2006, Brittany had been an important and constant part of Dezarae's life. The testimony of Rostorfer indicates that Dezarae was very attached to Brittany and did not recommend that Brittany's rights be terminated. The fact that there was a significant bond between Brittany and Dezarae was echoed by all of the witnesses, including the caseworker. All of the evidence in the record indicates that the contact between Brittany and Dezarae was more than minimal up to the time the trial court terminated the rights of Brittany.
 {¶ 37} After that time, Brittany was prohibited from seeing Dezarae by the trial court. Brittany cannot be held accountable for this circumstance, especially since the record reveals that she attempted to avoid it. She filed a motion to stay the termination of visitations pending appeal, but the motion was denied. Shortly after the reversal of the trial court's judgment terminating parental rights was filed, Brittany filed a motion to modify custody and indicated that she would like to have visits with Dezarae again. On July 19, 2007, the trial court scheduled this matter for pretrial on July 25, 2007. At the time of the September 2007 hearing, Brittany again requested visits, which the trial court again denied. Thus the lack of contact from September 21, 2006, until present is the result of the trial court's orders, not the actions of Brittany. While Brittany bears the responsibility for not completing the caseplan, her contact with Dezarae was not minimal and she was very attached to her mother before the trial court terminated visitation. The trial *Page 26 
court's findings to the contrary are not supported by clear and convincing evidence.
 {¶ 38} The trial court next considered the opinions of both Minter and Diequez. Both GALs recommended denying the motion and allowing mother a chance to change her lifestyle and regain custody. Minter's opinion occurred in 2006. Between the time of his opinion and the September 2007, hearing, Brittany stabilized her life. The evidence presented at the hearing is that she has maintained stable and safe housing for more than a year, has stable employment with sufficient income to support her children, has avoided any significant interactions with law enforcement, has quit drinking, does not use drugs, has completed counseling, has completed parenting classes, and has developed an appropriate support system. The testimony also indicated that she has ended her relationship with the Oney, which was one of the concerns the Agency expressed in the initial hearings. Although she allows Oney to be a part of their son's life, as is his right as a father, she has indicated that she does not want him to be a part of her life. In fact, the caseworker assigned to the case testified that he had no concerns about her ability to parent and that she seemed to be doing a good job with Eli. His biggest concern was with the amount of time that has passed since Dezarae has seen her mother due to the court's order. However, he also indicated that this could be overcome by slowly reintegrating Brittany back into Dezarae's *Page 27 
life. All of this evidence was undisputed and suggests that Brittany has made substantial progress in meeting the goals of the prior caseplan.
 {¶ 39} Contrary to this evidence, the trial court found that Brittany "left school, no longer has a job, has a new baby but has separated from the father, and is drinking again and involved with drugs." Dec. 12, 2007, Entry. "The court notes that after this long period of time the mother is in the same position as at the time of the original hearing in this case." Id. at 1-2. This finding is contrary to the evidence presented not only by Brittany but by Coldiron. The undisputed evidence is that Brittany does have a job with benefits and sufficient income. She also testified that she has not drank alcohol since before the initial hearing in 2006. No evidence was presented to dispute this evidence. As for the drug involvement, Brittany admitted that she had a misdemeanor charge for possession of drug paraphernalia. However, she testified that the items were not hers, but belonged to a former friend. This evidence was also undisputed. No evidence was presented subsequent to the hearing concerning the outcome of the charge. Additionally, Coldiron testified that Brittany took all drug screens requested by the agency. He did not know the outcome of those screens. Brittany testified that she had taken all of the screens, including a hair follicle screen, and had passed. This indicates *Page 28 
that Brittany is not using drugs.[6] Brittany did testify that she has not obtained her GED yet, but indicated that she would like to further her education someday. She stated that her current priority was raising her children. Finally, Brittany has separated from Oney. She did so upon learning of his potential involvement in more serious criminal matters, thus causing her to end the relationship. As discussed above, this was what the Agency wanted her to do, i.e. place the needs of her children before her other relationships. Rather than indicating a lack of change, the record clearly and convincingly indicates a substantial change in Brittany's behavior. The findings of the trial court in this matter are contrary to the evidence and not supported by clear and convincing evidence.
 {¶ 40} The third consideration the trial court stated was that the child has been in the custody of the agency since February 27, 2004, which is more than 12 months in a consecutive twenty-two month period. Although this alone is generally considered sufficient reason for terminating parental rights, the calculation of time only continues until the motion for permanent custody is filed, which was January 19, 2006. Dezarae had been in the temporary custody of the Agency for almost 23 months when the motion was filed. However, Brittany had *Page 29 
been in the custody of the Agency from February 27, 2004, until August 24, 2005, as well which accounts for 18 of the 23 months. Brittany and Dezarae were placed in the same foster homes with primary care of Dezarae left to Brittany. While the Agency had custody of both mother and daughter, the Agency could have chosen to place them in different foster homes. Instead they chose a legal placement with Brittany. Thus, Dezarae had not been removed from her mother's home, just from her mother's custody. In the 22 months prior to the motion being filed, Dezarae had been living apart from Brittany no more than nine months.[7] Additionally, the trial court made no finding that parental rights were terminated pursuant to R.C. 2151.414(B)(1)(d).[8]
 {¶ 41} Next the trial court found that Dezarae needs a legally secure permanent placement. This court does not dispute that claim. However, the trial court proceeds to reference the memorandum of the Agency[9]
finding that Brittany can "only function for a short period of time and then she relapses into her old way of life, i.e. instability, drugs and alcohol in her life, lack of education and lack of steady employment." Dec. 12, 2007, Entry at 2. As discussed above, most of *Page 30 
these findings are not supported by the record and are instead directly contradicted by the undisputed evidence presented at the September 2007, hearing.
 {¶ 42} Finally, the trial court states that it rejects the recommendations of the GALs because they want to give her additional time. The court held that Brittany has demonstrated that she is incapable of changing her life. Contrary to the trial court's holdings, the evidence at the second hearing clearly indicates that Brittany has made changes in her life. She is not perfect. When the motion for permanent custody was filed, Brittany was eighteen years old. At the time of the hearing, she was a twenty-year old woman who showed that she had matured and changed her behavior over the course of this case. She has employment with sufficient income, she is successfully parenting another child. She has suitable housing for more than a year and food for that child. She is paying her bills and has paid her past court fines. She has completed counseling and is willing to enter counseling again to help Dezarae adjust. She has completed parenting classes and has established a support system. She testified that she no longer drinks and all of her drug screens produced negative results. Not even the caseworker was able to state any reason which would make Brittany an unfit parent as of September 2007. Clearly, Brittany has demonstrated that she can and has changed. This evidence is directly contrary to the findings of the trial court. For the reasons discussed above, *Page 31 
the findings of the trial court are not supported by clear and convincing evidence. The first assignment of error is sustained.
 {¶ 43} Brittany's second assignment of error claims that the trial court erred in not returning custody of Dezarae to her or in the alternative in not holding a hearing on her motion. This assignment of error raises two issues: 1) was Brittany entitled to have custody returned to her and 2) was Brittany entitled to a hearing on her motion. The answer to the first question is no. The September 25, 2007, hearing was on the Agency's motion for permanent custody. The sole issue before the trial court at that time was whether the Agency should receive permanent custody. If the answer is yes, then Brittany's motion is moot. However, if the answer is no, this does not automatically mean that Brittany is entitled to have custody returned to her. See In reVaughn (Dec. 6, 2000), Adams App. No. 00CA692. The trial court instead maintains the jurisdiction to make any order permitted by R.C. 2151.415. Id. Although the judgment of the trial court granting the motion for permanent custody is in error, this does not mean that Brittany automatically gets custody. The trial court will need to determine the appropriate placement considering the facts present at this time. Additionally, the testimony presented by the Agency and confirmed by Brittany herself is that immediately returning Dezarae may not be appropriate due to their extensive separation. Brittany conceded that Coldiron's plan of supervised visits initially *Page 32 
and then working to unsupervised visits with a goal of custody would be appropriate. The trial court on remand, working with the Agency and Brittany, is in the best position to determine the appropriate placement at this time. Therefore the first issue is not well taken.
 {¶ 44} The second issue is whether the trial court is required to hold a hearing on Brittany's motion to modify custody. The trial court is mandated to hold a hearing on a motion to modify custody or terminate a dispositional order. R.C. 2151.353(E)(2). A hearing on a motion for modification is also required by Juvenile Rule 15(C) and Juvenile Rule 34(G). By granting the Agency's motion, the trial court in effect denied Brittany's motion. If the September 25, 2007, hearing to take additional evidence was such a hearing, then the trial court still needs to rule on that motion as it is no longer moot. If it was not, then the trial court needs to hold the hearing. The motion for modification of custody needs to be determined by the trial court before this court can review it. For this reason, the second assignment of error is moot.
 {¶ 45} Lastly, Brittany claims that the trial court erred in granting permanent custody because the Agency had failed to make a good faith effort to implement a reunification plan for Brittany and Dezarae upon remand. This court notes that the record indicates that upon remand, the Agency merely changed the caseplan to be temporary custody and did not include any services, such as *Page 33 
visitation, for Brittany. The Agency did conduct a home study, which determined that Brittany's home was suitable for Dezarae. However, the Agency did not make any attempts to even determine whether Brittany had made any progress towards completing the prior caseplan. Instead, the Agency in its memorandum to the court misstated, presumably by accident, the evidence and alleged that Brittany was currently charged with drug trafficking, had no employment, and was using alcohol.[10] No evidence of these claims was presented at the hearing and, in fact, undisputed evidence to the contrary was presented. The Agency also complained in its memorandum that Brittany was no longer receiving counseling. While this statement is true, it ignores the undisputed testimony that Brittany had completed counseling to the satisfaction of herself, her counselor and her psychologist. Although the Agency made numerous efforts to help Brittany prior to the filing of the motion for permanent custody in 2006, very few if any efforts have been made since then, including after the reversal and remand of the prior judgment from this court. This court is concerned about the general attitude of the Agency in regards to this case. However, since the first assignment of error has been sustained and the judgment of permanent custody is vacated as not being supported by clear and *Page 34 
convincing evidence, the behavior of the Agency in the past is moot. The third assignment of error is overruled.
 {¶ 46} This court notes that Brittany asks this court to vacate the judgment granting permanent custody and enter judgment restoring custody to her. In the alternative to restoring custody to her, Brittany asks this court to remand the matter for a hearing on her motion and to order the current judge to recuse himself. This court will vacate the judgment granting permanent custody to the Agency. The matter is remanded for further proceedings, including any necessary hearings on any pending matters. However, this court has no authority to order a judge to recuse himself. Brittany first must make that request in the trial court.
 {¶ 47} The judgment of the Court of Common Pleas of Marion County, Juvenile Division, is reversed and the matter is remanded for further proceedings in accord with this opinion.
Judgment Reversed and Cause Remanded
 SHAW, P.J., and PRESTON, J., concur.
[1] This court notes that this information was not corroborated and was denied by Brittany. There is no evidence that Brittany engaged in this behavior while Dezarae was present.
[2] At that time, all of Oney's convictions were misdemeanor in nature and were mainly for criminal trespass.
[3] Coldiron originally misspoke and said that Brittany "had been in for uh, drug trafficking." Tr. 15. However, this matter was quickly corrected and Coldiron stated that she had been cited for drug paraphernalia.
[4] Between the prior judgment of the trial court and April 2007, Brittany did not work. She was in a relationship with Oney. He worked at Whirlpool and supported her while she stayed home to raise their son. After she removed him from the home in March 2007, upon learning of his illegal activities, Brittany went back to work in April. She then changed jobs in late June.
[5] Both Brittany and Rostorfer testified that Brittany was the primary care giver for Dezarae while in the foster home. The only exception was the approximately three month period when Dezarae was placed in a separate foster home.
[6] This court notes that the Agency's brief in support of its position the Agency erroneously claims that Brittany was involved in drug trafficking. This is false. Oney was convicted of drug trafficking before the hearing, but several months after Brittany removed him from the home. No evidence or even allegation was made that Brittany was involved with Oney's trafficking. Although Coldiron misspoke and said Brittany was charged with trafficking at the September hearing, the matter was quickly corrected and Coldiron changed his testimony to claim that Brittany was charged with possession of drug paraphernalia.
[7] Dezarae was removed for approximately three to four months in 2004 and from August 24, 2005, until January 19, 2006, for a total of eight to nine months.
[8] As discussed above, the trial court failed to state under which provision it was terminating parental rights.
[9] This memorandum is the source of all the findings that are contrary to the evidence as it contains numerous incorrect statements that have no basis in the record and completely failed to consider the additional evidence presented at the September 2007, hearing, including that offered by the Agency's own employee.
[10] The Agency also misrepresented the timing of various events and stated that Brittany had changed nothing in her life and was still in the same position as at the time of the last hearing in July. This statement is clearly incorrect. Even the Agency's own caseworker acknowledged that he could not say whether Brittany was a suitable parent though he found no fault with her parenting of Eli. *Page 1